THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. DENNIS BROWN, Defendant-Appellant.

First District (1st Division)    No. 1—06—1760

Opinion filed February 23, 2009.

WOLFSON, J., specially concurring.
GORDON, ROBERT E., J., dissenting.

Patricia Unsinn and Christopher Kopacz, both of State Appellate Defender's Office, of Chicago, for appellant.

Anita M. Alvarez, State's Attorney, of Chicago (James E. Fitzgerald, Manny Magence, and Anna K. Weber, Assistant State's Attorneys, of counsel), for the People.

2

JUSTICE GARCIA delivered the opinion of the court:

Following a jury trial, the defendant Dennis Brown was convicted of possession of cocaine with intent to deliver within 1,000 feet of a school and sentenced to five years' imprisonment. The defendant presents a single issue: whether he was denied "a fair and impartial jury when the trial judge interfered with the selection of an unbiased jury by ordering the first potential juror who admitted that he could not be fair to return to the courtroom and observe Brown's trial to get an 'education as to how the system works.' " The defendant asserts plain error. Because we find the defendant has failed to meet his burden under the plain error doctrine, we affirm.

## BACKGROUND

During *voir dire* examination, the following colloquy took place between the trial judge and a prospective juror.

"THE COURT: Does anyone have any problems with the charges that I read to you? Okay.

\* \* \*

JUROR: My problem is I have property on the west side and I am familiar with problems to that extent—drug problems and so forth. So I have family members that are going through terrible times, I would say with addictions and so forth, they're being treated and so forth.

THE COURT: Do you know [the defendant]?

JUROR: No, I don't.

THE COURT: Have you ever seen him before?

JUROR: No, I have not.

THE COURT: All of us, including myself, have come in contact with this world of drugs. It has [a]ffected members of my family also.

Do you still think you can be fair and impartial?

JUROR: I don't feel that I can be.

THE COURT: I'm sorry?

JUROR: I don't feel that I can be.

THE COURT: Because you own property on the west side?

JUROR: No, because of how it [a]ffected me personally; what I have seen, how it [a]ffects society.

THE COURT: You are saying you don't think you can wait until you have heard all the evidence in this case before you reach a decision concerning [the defendant]; that you have automatically assumed that he is guilty of this charge?

JUROR: Not necessarily. I just have some concerns about illegal drugs and so forth. I know that it is just bad.

THE COURT: I'm just asking you now can you be impartial as to both sides? Can you wait until you have heard the evidence in the

case before you come to a conclusion or before you reach a decision as to whether this man is guilty or innocent; yes or no?

JUROR: I don't think so; no.

THE COURT: Any objection—

MR. DOMINIQUE [Assistant Public Defender]: No objection, your Honor.

MR. CURRAN [Assistant State's Attorney]: None.

THE COURT:—to excusing [this juror]? All right, [Juror]. We want to thank you for being frank and we're going to excuse you at this time. But I'm ordering you to return to court tomorrow morning at 11:00 o'clock because I plan on picking 12 individuals who are going to be able to be fair and impartial to both sides in this case and I think you need an education as to how the system works."

The judge then asked the remaining venire whether anyone else had a problem with the charges, whether anyone had a problem signing a not guilty or guilty verdict form, and whether anyone would hold the defendant's decision not to testify against him. No other prospective juror indicated that he or she had a problem.

Thereafter, the judge questioned each prospective juror individually, regarding (1) any prior service on a jury; (2) any close contact with a victim of a crime; (3) any criminal arrests; and (4) any involvement in a criminal case as a complainant or a witness. Following the judge's questioning, the State asked the venire whether anyone had a problem passing judgment on another person because of any religious, ethical, or moral considerations to which no one responded that he or she did. Last, defense counsel questioned 10 prospective jurors concerning their responses to the judge's questions.

At the jury trial, the evidence showed that on June 13, 2005, at around 11:30 p.m., Officer Joe Dahl and his partner were conducting surveillance near 2210 South Millard in Chicago. There, Officer Dahl observed the defendant engage in four separate hand-to-hand transactions where an unknown individual would hand the defendant money in exchange for a small object. Suspecting that these exchanges were narcotics transactions, Officer Dahl broke surveillance, drove to the defendant's location, exited his vehicle and witnessed the defendant toss a clear plastic bag containing suspected narcotics onto the ground. While his partner apprehended the defendant, Officer Dahl recovered the plastic bag, which contained a substance that tested positive for cocaine. A custodial search revealed that the defendant possessed $50 in his right pants pocket. The parties stipulated that the distance between 2210 South Millard and Paderewski School, located at 2221 Lawndale Avenue in Chicago, is 75 feet.

The defendant testified that he was getting into his car to go to a girlfriend's house when the police approached him with "guns and stuff," searched his car, and broke into his apartment. The police told the defendant that if he did not tell them "who had some guns," they were going to plant a bag of narcotics on him. When asked how he knew these individuals were police officers, the defendant responded, "[t]hey stopped me earlier that day in the alley and searched me, took my wallet, took my money, the same police."

The jury found the defendant guilty. This timely appeal followed.

## ANALYSIS

The defendant argues he was denied the right to a fair and impartial jury trial by the trial judge's actions that discouraged prospective jurors from responding candidly and openly when she excused the first prospective juror that stated he could not put aside his bias against drug-related offenses and punished this prospective juror by ordering him to return to the courtroom the following day to observe the trial process. The defendant admits he failed to preserve this issue for review by not objecting at trial and by not including the issue in his posttrial motion. The defendant asks that we reach this unpreserved error as plain error, arguing that the error denied him the right to a trial before an impartial jury. See *People v. Dixon*, 382 Ill. App. 3d 233, 244, 887 N.E.2d 577 (2008), citing *People v. Herron*, 215 Ill. 2d 167, 830 N.E.2d 467 (2005). He asserts the forfeiture rule should not be rigidly applied here where the unpreserved error concerns the conduct of the trial judge, citing *People v. Young*, 248 Ill. App. 3d 491, 498, 618 N.E.2d 1026 (1993) (forfeiture rule is flexible enough to allow consideration of judicial impropriety).

"The purpose of *voir dire* is to assure the selection of an impartial panel of jurors who are free from bias or prejudice." *People v. Terrell*, 185 Ill. 2d 467, 484, 708 N.E.2d 309 (1998), citing *People v. Williams*, 164 Ill. 2d 1, 16, 645 N.E.2d 844 (1994). The manner in which *voir dire* is conducted as well as its scope lie with the discretion of the trial judge. *Williams*, 164 Ill. 2d at 16. An abuse of that discretion will only be found where the judge's conduct "thwarted the selection of an impartial jury." *Williams*, 164 Ill. 2d at 16.

Initially, we note there is no authority in Illinois that directly addresses the issue at hand—whether the trial judge's actions in "punishing" the first prospective juror to indicate that he was biased thwarted the selection of an impartial jury. The parties cite to authority from other jurisdictions that supports their respective positions. The defendant points to *United States v. Rowe*, 106 F.3d 1226 (5th Cir. 1997), which he contends should be read in light of the supreme court's

decision in *People v. Strain*, 194 Ill. 2d 467, 782 N.E.2d 263 (2000), that recognizes the need to probe for bias on the part of prospective jurors. The State points to *United States v. Colabella*, 448 F.2d 1299 (2d Cir. 1971), and *State v. Rannels*, 333 N.C. 644, 430 S.E.2d 254 (1993), for its position that on the facts before us, it would be no more than speculation to say the remaining prospective jurors were intimidated into not revealing any bias.

We begin with our own observations regarding the *voir dire* procedure below. First, the parties agreed to excuse the prospective juror based on his statement that he could not set aside his negative feelings toward the pending drug-related charges. The trial judge granted the parties' motion and excused the prospective juror. Having accomplished all that could have been accomplished, we question the need for the trial judge to have engaged in a subsequent admonishment of the prospective juror in the presence of the venire. If the trial judge saw a need to instruct the prospective juror on his civic duty to serve on a jury based on what he stated in open court, the trial judge was free to direct the juror to remain until the end of the proceedings that day to speak with him outside the presence of the remaining prospective jurors. This would have avoided creating an appellate issue for the defendant. Second, jury selection was completed that afternoon and the dismissed venire person had satisfied his duty under the "one day/one trial" program established by the chief judge of the circuit court of Cook County. We question the basis to extend that duty. Third, as a juror is entitled to a daily *per diem* fee for jury service, we see no need to have "educated" the dismissed venire person at the expense of Cook County taxpayers. Fourth, if the trial judge felt the need to educate the venire person as to the workings of our criminal justice system, she should have been willing to convey whatever instruction she deemed warranted directly to the venire person. We see no relation between a claimed inability to set aside a bias and the "education" one might receive by sitting through one day of a trial. Finally, and perhaps most importantly, it cannot be denied that a citizen may have a legitimate inability to set aside a bias, a bias that is not ameliorated by a one-day "education" by sitting in on a trial. The trial judge herself thanked the venire person for "being frank." It is precisely that "frank" exchange between the prospective juror and the questioner that is the primary objective of *voir dire*. Anything that might reduce that frank exchange should be avoided.

We set out these observations because, as we have stated, the exchange was unnecessary in the way it occurred. Our legal analysis, however, focuses on the defendant's claim that we should find plain error.

For plain error to apply, the defendant must make either of two showings: (1) the evidence was close, regardless of the seriousness of the error; or (2) the error was so serious that the closeness of the evidence does not matter. *People v. Parker*, 358 Ill. App. 3d 371, 374, 832 N.E.2d 858 (2005). The defendant's only contention is that the trial judge's conduct was so serious that he was denied a fair and impartial trial. We examine the authorities cited by the parties to determine whether the defendant has met this second prong showing.

In *Rowe*, the principal case on which the defendant relies, the defendants argued that certain comments made by the trial judge during *voir dire* frightened the venire into silence, thus rendering the jury selection process meaningless. Specifically, the defendants pointed to the following exchange between the trial judge and a prospective juror.

> " 'COURT: Are you telling me that you cannot put aside, you cannot follow the order of this court and put aside your personal opinions, and listen to the evidence in this case and render a fair and impartial verdict? Is that what you're saying?
>
> A: No. What I'm saying is that I don't feel that my verdict could be fair.
>
> COURT: That's just what I'm asking you. Why not? ... You're refusing to put aside your personal opinions? Is that what you're telling the court?
>
> A: No, I'm not refusing. I'm just saying that I think that it will affect my decision as far as, you know, as the verdict is concerned.
>
> COURT: All right. Put her on February, March and April's panel to come back. And you will be coming back again, and again, and again.... And see if you can figure out how to put aside your personal opinions and do your duty to your country as a citizen, because this kind of answer which is clearly made up for the occasion is not really great. You are excused.' " *Rowe*, 106 F.3d at 1228.

Although this interaction occurred at the bar, it later became evident that the entire panel heard the discussion. In the face of the trial judge's treatment of the first prospective juror to reveal an inability to be unbiased, another prospective juror nonetheless indicated that she had a relationship that might keep her from being fair and impartial, and in the presence of the entire panel, the judge responded:

> " 'It is appalling, actually, that you would come into a court, and presume that people were guilty because they were standing here charged with a crime. That's not our system. And apparently you will *not*, or cannot follow the instructions of the court, so you're excused. Put her back on the jury panel for February, March and April, and perhaps you can take [*sic*] some remedial constitutional inquiries in the meantime. Does anyone else feel that these people are guilty, without hearing anything further? Now, I don't want to

scare you into not responding. You will not be taken into custody.' "
*Rowe*, 106 F.3d at 1228-29.

"At the end of the *voir dire*, defense counsel moved to strike the panel on the grounds that in light of the court's treatment of the two members of the venire who stated their views, other potential jurors were unlikely to speak up and tell the truth about potential bias for fear of the court's reaction." *Rowe*, 106 F.3d at 1229.

The trial court, in response to defense counsel's motion, "attempted to undo the damage." *Rowe*, 106 F.3d at 1229. She asked the venire, " 'Is there anyone else, *** and please raise your hand, that was frightened by the court, to where you didn't want to answer any questions along those lines?' " *Rowe*, 106 F.3d at 1229. No prospective juror answered affirmatively. *Rowe*, 106 F.3d at 1229.

Following conviction but prior to sentencing, one of the defendants filed a motion for a new trial, alleging that the trial court intimidated the jury panel into silence. According to the motion, a panel member was prepared to testify that after the initial exchange between the trial court and the potential juror who reported bias, she "felt like she had no recourse but to sit there and keep her mouth shut, and that was the best thing she could do." *Rowe*, 106 F.3d at 1229. The trial judge denied the motion.

The Fifth Circuit Court of Appeals reversed and remanded, finding that the trial court abused its discretion when it failed to dismiss the panel on defense counsel's motion. *Rowe*, 106 F.3d at 1230. While acknowledging the presumption that all prospective jurors answer truthfully to questions posed during *voir dire*, the court of appeals held that this presumption does not apply where potential jurors are given reason to fear reprisals for truthful responses. *Rowe*, 106 F.3d at 1230. The court noted that both panel members who indicated a potential bias were "accused by the [trial] court of refusing to follow instructions and attempting to avoid jury service, and then sanctioned." *Rowe*, 106 F.3d at 1229-30. Thus, the court determined that the trial court abused its discretion because its actions "cut off the vital flow of information from the venire to court." *Rowe*, 106 F.3d at 1230. The court in *Rowe* further held that the prejudice aspect need not be explored, stating that "[d]efendants need not show specific prejudice from a *voir dire* procedure that cut off meaningful responses to critical questions." *Rowe*, 106 F.3d at 1230.

In contrast, the Second Circuit Court of Appeals in *Colabella*, and the North Carolina Supreme Court in *Rannels*, found no error in addressing similar claims involving the jury selection process.

In *Rannels*, the district attorney asked whether any members of the jury pool had personal or business engagements that would detract

their attention from the case. *Rannels*, 333 N.C. at 656, 430 S.E.2d at 260. When one prospective juror expressed that his plans to attend nursing school would be "in the back of [his] mind," the trial court stated:

> "Well, you are going to sit here through the trial of the case, but I'm not going to require you to sit on this case. So when the other jurors are excused, you are to remain in the courtroom.... I want you to sit on the front row, sir, so you can hear what's going on." *Rannels*, 333 N.C. at 656, 430 S.E.2d at 260-61.

Although the defendant argued that the trial court's actions "chilled" the honest responses of other panel members, the *Rannels* court determined that nothing in the record substantiated the defendant's contention. *Rannels*, 333 N.C. at 656, 430 S.E.2d at 261. Rather, the *Rannels* court reasoned, "It could just as well be argued that the court's reaction to the juror's response reinforced among the other prospective jurors the need to be forthright and honest in their answers." *Rannels*, 333 N.C. at 656, 430 S.E.2d at 261. Ultimately, the *Rannels* court rejected the defendant's position because it relied on speculation. *Rannels*, 333 N.C. at 656, 430 S.E.2d at 261.

In *Colabella*, as here, defense counsel did not "object to the swearing of the jury[, which] indicated that he too believed that the jury as finally selected was not infected with prejudice." *Colabella*, 448 F.2d at 1303. Here, not only did defense counsel not object, but he was allowed to directly examine the remaining venire persons to ensure that the jury ultimately decided upon would be fair.

Because we find the circumstances in this case to be more closely aligned with the circumstances in *Colabella* and *Rannels*, we decline to follow *Rowe*. To be clear, we have no disagreement with the *Rowe* decision.[1] However, the differences between *Rowe* and the instant case are too striking to control the outcome. We note four such differences.

First and foremost, the error in *Rowe* was preserved. The trial judge was given the opportunity by a defense objection to strike the venire panel and continue with the jury selection with an untainted group of prospective jurors. Thus, the federal court of appeals reviewed the trial judge's conduct under an abuse of discretion standard.

Second, while the court in *Rowe* made note that "[d]efendants need not show specific prejudice from a *voir dire* procedure that cut off meaningful responses to critical questions" (*Rowe*, 106 F.3d at 1230), the *voir dire* procedure undertaken here differed from that in

---

[1]We note that in *Rowe* the federal court of appeals ruled the trial court should have dismissed the entire panel on the defendants' motion. No similar motion was made here.

*Rowe*. See 177 Ill. 2d R. 431 (parties are allowed to supplement the trial court's examination "by such direct inquiry as the court deems proper"). In Rowe, the trial court did not allow counsel to address the panel directly. *Rowe*, 106 F.3d at 1227. Here, defense counsel was allowed to question all the prospective jurors after the initial *voir dire* by the trial judge, doing so only as to some. Defense counsel was free to ask questions that might ferret out actual bias on the part of any of the prospective jurors based on any ground, including whether the trial judge's treatment of the dismissed prospective juror silenced the remaining prospective jurors that might harbor bias. Apparently, defense counsel saw no need to engage in such questioning.

Third, the court in *Rowe*, in distinguishing the authority cited by the government, noted that the case before it differed "both in kind and in degree." *Rowe*, 106 F.3d at 1228. We find the trial judge's remarks here differ both in kind and degree from the federal district court's actions properly criticized in *Rowe*. While the trial judge here imposed the requirement that the dismissed venire person return the next day, that action did not rise to the penalty imposed in *Rowe*, where the dismissed juror was ordered to return for the " 'jury panel for February, March and April, and perhaps [to take] some remedial constitutional inquiries in the meantime.' " *Rowe*, 106 F.3d at 1228.

Finally, the record in *Rowe* contained the affidavit of a venire person that was prepared to testify that she was intimidated by the trial court's conduct. *Rowe*, 106 F.3d at 1229. Here, no showing has been made that the trial judge's admonishment to a single prospective juror, who was dismissed and then ordered to return the following day, blanketed the remaining venire with intimidation such that no frank exchange could occur.

We find the *Rowe* case distinguishable from the case before us. The analysis in *Rowe* does not convince us that the limited remarks and actions of the trial judge here thwarted the selection of an impartial jury. Our conclusion that the defendant has failed to establish that the conduct of the trial judge affected the fairness of the judicial process also rests on the reasoning of the *Colabella* and *Rannels* courts.

As in *Rannels*, there is nothing in the record to substantiate the defendant's claim that the court's conduct chilled the responses of the 23 remaining prospective jurors. The defendant even admits that it is "impossible to precisely measure the prejudice [he] suffered as a result of the trial judge's improper comments." Nevertheless, the defendant surmises that "[t]he fact that no on else admitted a possible bias supports the likelihood that the judge discouraged them from doing so." We reject the defendant's reasoning. As the *Rannels* court noted, the

opposite effect could "just as well be argued." *Rannels*, 333 N.C. at 656, 430 S.E.2d at 261. That no other prospective juror reported bias when the trial judge put this question again to the remaining venire, may indicate nothing more than no other potential juror harbored bias or prejudice. This explanation is perhaps entitled to more sway here where the defendant through his counsel was given the opportunity to inquire about possible bias when he conducted *voir dire*, an opportunity that does not appear to have been provided in *Rannels*.

While the efforts by the trial judge in *Colabella* might well serve as an example for the trial judge here in the steps that should be taken when a prospective juror expresses uncertainty in his or her ability to set aside bias, the court of appeals in *Colabella* also recognized that such efforts may not always succeed. "That a juror might not have been impartial, is indeed, a possibility. But, when we venture into speculation over thoughts or attitudes not manifest, there is always the chance that any jury impaneled to try a case may include an individual whose prejudices have not been revealed. We note that nothing has been called to our attention to indicate that in this case, any juror was in fact not impartial." *Colabella*, 448 F.2d at 1302. We echo the *Colabella* court's observations here. We emphasize there is nothing in the record to indicate that any juror seated in this case was not impartial.

Like the courts in *Colabella* and *Rannels*, we reject, as grounded on nothing more than speculation, the defendant's contention that the conduct engaged in by the trial judge here impacted his right to a fair trial.

We also conclude that the rationale behind applying the forfeiture rule less strictly, as noted in *Young*, has no place here.

> "The making of an objection to questions or comments by a judge poses a practical problem for the trial lawyer. It can prove embarrassing to the lawyer, but, more importantly, assuming that most juries view most judges with some degree of respect, and accord them a knowledge of law somewhat superior to that of the attorneys practicing before the judge, the lawyer who objects to a comment or question by the judge may be viewed with considerable suspicion and skepticism by the very group whom he is trying to convert to his client's view of the facts, thereby perhaps irreparably damaging his client's interests." *People v. Sprinkle*, 27 Ill. 2d 398, 400, 189 N.E.2d 295 (1963).

Here, the trial judge allowed the defendant the opportunity to ferret out any bias among the remaining potential jurors through *voir dire* questioning to ensure his right to a fair trial. While "it would have been better if some of the comments [by the trial judge] had not been

made," as we stated in *Young*, 248 Ill. App. 3d at 503, we see no reason to forego applying the forfeiture rule here.

## CONCLUSION

Based on the record before us, we find the *voir dire* procedure provided by the trial judge below allowed the defendant to sufficiently question prospective jurors to select a fair and impartial jury, even in the face of an exchange by the trial judge with a dismissed prospective juror in the presence of the venire that we find, while unnecessary, did not deprive the defendant of a fair trial. The claimed error by the defendant is forfeited. See *People v. Carlson*, 79 Ill. 2d 564, 576-77, 404 N.E.2d 233 (1980) (where real justice has not been denied, errors that could have been corrected but not preserved are forfeited).

For the foregoing reasons, we affirm the judgment of the trial court.

Affirmed.

JUSTICE WOLFSON, specially concurring:

I agree with Justice Garcia's careful analysis of the case law and with his "observations" of the trial court's *voir dire* procedure. The civics lesson conducted by the trial judge in the presence of prospective jurors should not have happened.

The question then becomes whether the trial judge's conduct was in error. We cannot conduct a plain error analysis until we find there was an error. See *People v. Sims*, 192 Ill. 2d 592, 621 (2000). Because I am unable to conclude an error was committed, I concur in the result reached by Justice Garcia.

JUSTICE ROBERT E. GORDON, dissenting:

I respectfully dissent.

As the majority indicates, "[t]he purpose of *voir dire* is to insure the selection of an impartial panel of jurors free from bias or prejudice." *People v. Stewart*, 343 Ill. App. 3d 963, 977 (2003). The trial judge is in a sensitive position when examining prospective jurors, and the judge's conduct can create an atmosphere that taints the jury selection process and thus deprives a party of a fair trial. *Rowe*, 106 F.3d at 1230.

The majority states that it has "no disagreement with the *Rowe* decision," but that it feels constrained *not* to apply *Rowe* to this particular case, because of several "striking" differences between this case and *Rowe*. 388 Ill. App. 3d at 8.

One difference noted by the majority was that defense counsel in

the case at bar was "free" to question the prospective jurors directly about whether they felt intimidated by the trial court into remaining silent. 388 Ill. App. 3d at 9. What could defense counsel ask? "If you were intimidated into saying nothing by the trial judge, who is sitting right over my shoulder, please let me know." If any jurors had been intimidated into silence, then the surest proof of that would be their continued silence. See *People v. Vargas*, 174 Ill. 2d 355, 365 (1996) (" '[j]urors are ever watchful of the attitude of the trial judge *** [and] his lightest word *** may prove controlling' "), quoting *People v. Marino*, 414 Ill. 445, 450-51 (1953).

In *Rowe*, the trial court tried this approach and it failed. In *Rowe*, the trial court asked the venire: " 'Is there anyone else, was there anyone, and please raise your hand, that was frightened by the court, to where you didn't want to answer any questions along those lines?' " *Rowe*, 106 F.3d at 1229. Not surprisingly, no juror raised a hand. *Rowe*, 106 F.3d at 1229. Nonetheless, following conviction, a panel member was prepared to testify that she "felt like she had no recourse but to sit there and keep her mouth shut, and that was the best thing she could do." *Rowe*, 106 F.3d at 1229. Thus, we know from *Rowe* that asking the prospective jurors directly is not the solution.

A second difference noted by the majority was the fact that in *Rowe* there was a proffer of testimony from an intimidated juror, whereas in the case at bar, there was no similar offer of proof. 388 Ill. App. 3d at 9. This is true, but requiring postverdict information would only encourage a system where defense counsel routinely interrogate jurors, after a guilty verdict, about their possible partiality. Do we want defense counsel tracking down jurors after they leave the courthouse?

Years ago, this court warned of the "serious dangers in permitting *ex parte* communications between the unsuccessful litigants and the jurors." *Chalmers v. City of Chicago*, 92 Ill. App. 3d 54, 57 (1980). This court explained:

" 'To allow jurors' affidavits *** would tend to pollute our system of independent deliberations by the jury. Every party who was dissatisfied with a jury verdict would feel able at least to attempt to effect a revision thereof. Such a situation leaves jurors open to harassment and intimidation long after they have been discharged from their official duties and thus after they are outside the watchful eye of the court.' " *Chalmers v. City of Chicago*, 92 Ill. App. 3d 54, 57 (1980), quoting *Roberts v. Kettelle*, 116 R.I. 283, 300, 356 A.2d 207, 217 (1976) (Supreme Court of Rhode Island).

Because of fears of juror harassment, the appellate court has always discouraged parties from trying to obtain postverdict affidavits from

jurors. As a result, the well-established rule in this state is that post-verdict affidavits or testimony from a juror regarding "motive, method or process" cannot be used to impeach a jury verdict. *People v. Lee*, 294 Ill. App. 3d 738, 744 (1998); *People v. Wilson*, 246 Ill. App. 3d 311, 322 (1993).

Postverdict juror affidavits are permitted only if they provide evidence of excluded events or physical intimidation, and only if they do not show how these events effected the jury's reasoning. *Lee*, 294 Ill. App. 3d at 744; *Wilson*, 246 Ill. App. 3d at 322. In the case at bar, we already know that physical intimidation occurred; we do not need a juror affidavit for that. The trial court's threat to physically confine a juror within the courtroom in order to punish qualifies as physical intimidation. Physical confinement is, after all, the type of punishment that a trial court often uses to enforce its power in a contempt situation. Since we know what transpired, the only additional information that could be provided by a juror affidavit is how the juror felt about it emotionally and how it effected his or her deliberations. Affidavits which showed that the trial court's conduct affected the jury's partiality and actually prejudiced defendant would also, by necessity, suggest their effect on the jury's reasoning—and thus be prohibited. *Lee*, 294 Ill. App. 3d at 744; *Wilson*, 246 Ill. App. 3d at 322.

Finally, the difference that was "foremost" according to the majority was that in *Rowe*, the defense objected and in the case at bar, the defendant did not. 388 Ill. App. 3d at 8. When errors are directed at the trial court's conduct, the waiver rule is relaxed. *People v. Young*, 248 Ill. App. 3d 491, 498 (1993). "[T]his court has previously observed that the fundamental importance of a fair trial and the practical difficulties involved in objecting to the trial court's conduct compel a less rigid application of the waiver rule." *People v. Taylor*, 357 Ill. App. 3d 642, 647 (2005), citing *People v. Stevens*, 338 Ill. App. 3d 806, 810 (2003).

Our supreme court has held that "the plain-error doctrine allows a reviewing court to consider unpreserved error when (1) a clear or obvious error occurred and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error, or (2) a clear or obvious error occurred and that error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence." *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007).

In the case at bar, the second prong of the plain-error analysis applies: an error so serious that it affected the fairness of defendant's trial. The right of a criminal defendant to an unbiased, open-minded

trier of fact is the very foundation of our criminal justice system. *Taylor*, 357 Ill. App. 3d at 647, citing *People v. Eckert*, 194 Ill. App. 3d 667, 673 (1990). The right to a fair trial is guaranteed to all criminal defendants by the due process clauses of both the United States (U.S. Const., amend. XIV) and the Illinois Constitutions (Ill. Const. 1970, art. I, §2). *Taylor*, 357 Ill. App. 3d at 647, citing *People v. Hattery*, 183 Ill. App. 3d 785, 801 (1989).

In distinguishing between reversible and nonreversible admonishments to the venire panel, our colleagues on the federal bench have drawn a line between criticism and threats, with criticism falling on the non-reversible side and threats of punishment falling on the reversible side. For example, in *Rowe*, the federal appellate court found error where the trial court threatened to punish a juror by forcing her to "com[e] back again, and again, and again" until the juror learned "how to put aside [her] personal opinions and do [her] duty to [her] country as a citizen." *Rowe*, 106 F.3d at 1228. By contrast, in *United States v. Vega*, 221 F.3d 789, 803 (5th Cir. 2000), the same appellate court found no error because the trial judge "did not expressly or impliedly threaten to punish venire members who claimed bias," but merely criticized a juror for volunteering her bias before the question had even been asked. *Vega*, 221 F.3d at 803. Accord *Colabella*, 448 F.2d at 1304 (no error where judge's comments merely expressed "displeasure" with jurors who claimed to have prejudged the case). Applying the distinction drawn by our colleagues on the federal bench to the facts of the case before us reveals that the trial court's behavior fell on the reversing side of the line.

The majority's opinion relies heavily on the North Carolina case of *Rannels*. *Rannels*, 333 N.C. at 656, 430 S.E.2d at 260-61. In *Rannels*, the trial court punished a prospective juror who stated he could not give the case the attention it deserved. *Rannels*, 333 N.C. at 656, 430 S.E.2d at 260-61. The trial court punished the juror by requiring him to sit through the trial, in the front row. *Rannels*, 333 N.C. at 656, 430 S.E.2d at 260-61. The North Carolina Supreme Court seemed to approve of the trial court's behavior, stating that the trial "court's reaction to the juror's response [could have] reinforced among the other prospective jurors the need to be forthright and honest." *Rannels*, 333 N.C. at 656, 430 S.E.2d at 261. Since the holding in *Rannels* is based largely on the approval of punishing conduct, I find the case of little persuasive value to Illinois courts. *Rannels*, 333 N.C. at 656, 430 S.E.2d at 260-61. The majority in the case at bar also disapproves of punishing conduct. 388 Ill. App. 3d at 5. As a result, we should reject *Rannels* and adopt instead the distinction drawn by the federal courts.

I have no doubt that if the trial judge in the case at bar had

required the punished juror to return to the courthouse every day for a year, then my colleagues in the majority would find plain error. See 388 Ill. App. 3d at 9. Our difference then is not one of kind but degree. I find that the threat of one day's punishment was a sufficient deterrent to require reversal. *People v. Branch,* 123 Ill. App. 3d 245, 251-52 (1984) (it was more likely than not that the court's threat of overnight sequestration intimidated a juror into reaching a verdict).

I realize that a judge has a difficult job during jury selection, especially when some members of the array try to shun their responsibilities, and others witness their awkward attempts to avoid jury service. However, when a judge punishes a prospective juror in front of the entire array of jurors for admitting that he or she cannot be fair, I believe the entire array of jurors has been tainted, and the parties cannot receive a fair trial. The trial court then has a duty to declare a mistrial, even if one was not requested.

I find *Rowe* persuasive. Unlike the majority, I do not find meaningful differences. Therefore, I must dissent.